# UNITED STATES DISTRICT COURT
## DISTRICT FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| DONNA MARIE COBURN | : | |
| 17823 Benchmark Drive, | : | |
| Dallas, Texas 75252,  on behalf | : | |
| of herself and all others similarly situated, | : | Civ. No. _____ |
| | : | |
| Plaintiff, | : | CLASS ACTION |
| | : | |
| -against- | : | **COMPLAINT FOR VIOLATIONS** |
| | : | **OF THE EMPLOYEE RETIREMENT** |
| EVERCORE TRUST COMPANY, N.A. | : | **INCOME SECURITY ACT** |
| 1099 New York Avenue, N.W., 6th Floor, | : | |
| Washington, D.C. 20001, | : | JURY TRIAL DEMANDED |
| | : | |
| Defendant. | : | |

---

Plaintiff, Donna Marie Coburn ("Plaintiff"), individually and on behalf of the class of other similarly situated employees and former employees who were participants in and beneficiaries of the J. C. Penney Corporation Inc. ("JC Penney" or the "Company") Savings, Profit-Sharing and Stock Ownership Plan (the "Plan") allege the following based upon the investigation of counsel, which included a review of certain Plan documents; review of Internal Revenue Service Form 5500s ("Form 5500s") filed by the Plan with the United States Department of Labor ("DOL"); discussions with Plan participants; filings by JC Penney with the United States Securities and Exchange Commission ("SEC"); and press releases and other public statements issued by the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      SUMMARY OF THE ACTION

1.      This is a class action brought against the Plan fiduciary Evercore Trust Company, N.A. ("Evercore Trust" or "Defendant") by its participants pursuant to Section 502 of the

Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132.  The Plan is a defined contribution plan sponsored by JC Penney for eligible employees.  This class action is brought on behalf participants in the Plan who invested in and/or held the JC Penney Company Stock Fund between May 15, 2012 and the present (the "Class Period").

2.      Evercore Trust knew through public information that continued investment in Company stock during the Class Period was imprudent.

3.      For instance, Evercore Trust knew that JC Penney had consistently underperformed with respect to major stock market indices and the S&P Department Store Index[1] since 2008, and began a more rapid decline in January 2011.  Because of the hopeless situation concerning the Company's prospects, the activist investor William Ackman ("Ackman"), fresh off his failed attempt at another retail turnaround at Target Corporation, joined JC Penney's Board of Directors in February 2011 in an effort to lead the Company's turnaround efforts.   At that time, Ackman's hedge fund, Pershing Square Capital Management L.P., owned approximately 18% of JC Penney's stock.

4.      On November 20, 2011, Ackman installed a new Chief Executive Officer, Ron Johnson ("Johnson"), a former Apple executive to help with "transformative" changes Ackman viewed as necessary, including the ill-fated decision to eliminate the Company's mainstay device to increase foot traffic and cause sales: the coupon.

5.      On January 25 and 26, 2012, despite the fact that a majority of JC Penney's customers used coupons at its stores, Johnson announced his "Fair and Square Pricing" strategy which eliminated all coupons and discounts for JC Penney's customers.   He also announced his

---

[1]   The Company defines the S&P Department Store Index in its Forms 10-K to be the S&P Retail Index for Department Stores, which incorporates the performance of JC Penney, Dillard's, Macy's, Kohl's, Nordstrom and Sears.

plan to open "stores within stores" at JC Penney's stores, which would house brands with which JC Penney's regular customers had never before experienced at its stores.

6.      Immediately upon implementation of these radical and untested strategies, the Company's financial performance suffered.   After the release of the Company's first quarter 2012 results on April 22, 2012, the Company experienced its greatest single-day loss in 40 years when it plunged 19.7% dropping from $33.32 to $26.75, which was greater than the 19.2% loss it experienced on Black Monday 1987.   From there, the stock continuously plummeted as the easily foreseeable results of Johnson's tin-eared debacle unfolded.   The stock would proceed to fall from $26.75 to as low as $4.90, or **over 80%**, during the Class Period.   This translated into losses of over **$300 million** for the Plan and its participants and beneficiaries.[2]   These disastrous results, of course, followed over a year of warning signs that the Company's financial health was moving rapidly towards crisis. Prior to the beginning of the Class Period, gross margins declined year-over-year in every quarter but one starting with the third quarter 2010.   Likewise, revenues were in steady decline starting in the second quarter 2011, including back-to-back-quarters of nearly 5% reduction—to put this in perspective, the Company suffered only a little worse in the calamity of 2008 with a year-over-year annual 6.9% reduction in revenues.

7.      Unsurprisingly, during this time, every analyst that followed the Company downgraded their advice to investors with three of four of them recommending selling the Company's stock by March 2013.

8.      Evercore Trust, of course, knew all of this because its sole fiduciary responsibility with respect to the Plan was to monitor the prudence of maintaining JC Penney stock as an

---

[2]   Forms 5500 for the years 2012 and 2013 disclose that the Plan held Company stock worth $514, 586, 000 on January 1, 2012 and $114, 927,000 on December 31, 2013.   The Company's stock traded at $34.96 on January 2, 2012 and $26.75 at the beginning of the Class Period on May 15, 2012.

investment option in the Plan.  Armed with this knowledge, Evercore Trust knew no later than April 22, 2012, that allowing participants to continue to hold and/or make new investments in Company stock was imprudent.

9.      Because Evercore Trust failed to liquidate the Plan's holdings of Company stock and/or failed to prevent participants from continued investment in Company stock, Evercore Trust breached its fiduciary duties to the Plan and its participants and beneficiaries.

10.      Evercore Trust is therefore liable for losses suffered by the Plan participants during the Class Period, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a).  Plaintiffs seek appropriate equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including, without limitation, the equitable remedy of surcharge, restitution, monetary relief and lost profits from alternative prudent investments.

## II.      JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA §502(e)(l), 29 U.S.C. § 1132(e)(l).

12.      Venue is proper in this district pursuant to ERISA § 501 (e)(2), 29 U.S.C. § 1132(e)(2), because Evercore Trust has offices in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and it is likely that most of the potential witnesses and documents are located within this district.

## III.      PARTIES

13.      Plaintiff is a Plan "participant" within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).   She is a former employee who purchased and held the JC Common Stock Fund in her retirement account through the Plan during the Class Period.

14.     Defendant Evercore Trust is a national trust bank and a wholly-owned subsidiary of Evercore Partners, Inc.   Evercore Trust provides specialized investment management, independent fiduciary, and trustee services to employees benefit plans.   Evercore Trust's Washington, D.C. office is located at 1099 New York Avenue, N.W., 6th Floor, Washington, D.C. 20001.

## IV.   THE PLAN

15.     The Plan is a defined contribution benefit plan established by JC Penney for eligible employees as a benefit.   JC Penney is the "sponsor" of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).   The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and an eligible individual account plan within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3).   As of December 31, 2011, at or about the start of the Class Period, there were 168,372 employees or former employees of JCP who were participants in the Plan which had total assets of approximately $3.5 billion.

16.     The Plan is a legal entity that can sue or be sued.   ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).   In this breach of fiduciary duty action, the Plan is neither a plaintiff nor a defendant. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the case law interpreting it, the relief requested in this action is for the benefit of the Plan.

17.     The Plan invests in JC Penney stock along with mutual funds and other investment vehicles. As explained in the operative Plan document, as amended January 26, 2010, the purpose of the Plan is to "offer eligible associates the opportunity to [,among other things,] save for their retirement . . .."

18.     Since December 17, 2009, under a trust agreement with JC Penney (the "Trust

5

Agreement"), Evercore Trust has been a Plan fiduciary with respect to the management and disposition of the J.C. Penney Common Stock Fund.

19.     The Plan has been heavily invested in Company stock.  As of January, 2012, the Plan held approximately $515 million in Company stock, representing over 14% of the assets of the Plan.  As of December 31, 2012, the Plan held approximately $231 million in Company stock, or less than half the amount it held at the beginning of the year, despite annual contributions by participants and any Company matching contributions that presumably should have increased the amount of Company stock holdings in the Plan.  As of December 31, 2013, the Plan held approximately $115 million in Company stock.  This once again halved the Plan's assets held in Company stock.

20.     As a result of Evercore Trust's failure to take action to protect Plan participants from their massive exposure to Company stock, the Plan suffered approximate losses during the Class Period of $300 million.  Plan participants who invested in JC Penney stock when it was imprudent to do so were substantially damaged.  Plan participants who held JC Penney stock falsely believing it was an appropriate investment for retirement suffered losses from holding JCP stock versus alternatives available under the Plan.  Had Defendant acted prudently by suspending transactions in JC Penney stock through the Plan, Plan participants would have avoided the substantial damage suffered.

## V.     EVERCORE TRUST'S FIDUCIARY DUTIES TO THE PLAN

21.     Under the Trust Agreement with JC Penney, Evercore Trust, "as named fiduciary and investment manager," "at all times ha[d] the exclusive fiduciary authority and responsibility" for monitoring the JC Penney Common Stock Fund as a prudent investment option for the Plan.

22.     In service of this fiduciary authority and responsibility to act prudently, Evercore

Trust was explicitly granted the discretionary power to restrict or limit the ability of Plan participants to purchase or hold JC Penney stock, including the power to "eliminate the Company Stock Fund as an investment option under the Plan and to sell or otherwise dispose of all of the Company Stock held in the Company Stock Fund."

23.     Although JC Penney intended the Company Stock Fund to be a "permanent feature of the Plan," Evercore Trust and JC Penney acknowledged in the Trust Agreement that Evercore Trust "may have an obligation to determine whether it is required by applicable ERISA fiduciary standards to disregard the Company's intent with respect to the Company Stock Fund."

## VI.     FACTS

### A.     JC Penney Fails to Keep Up With Peers After 2008

24.     In business for over 110 years, JC Penney is a major retail department that operates approximately 1,142 stores throughout the United States and Puerto Rico.

25.     Following the financial crisis of 2008, the Company's financial performance continually trailed the relative performance of major indices and the S&P Department Store Index, which JC Penney highlights in the beginning of its Forms 10-K.

26.     In its Form 10-K for 2009 (p.9), the Company shows how it lagged behind the S&P Department Store Index by 20 basis points and the broader S&P 500 by almost 40 basis points.[3]

27.     Likewise, in its Form 10-K for 2010 (p.12), the Company shows how it lagged behind the S&P Department Store Index by 19 basis points and the broader S&P 500 by almost 50 basis points.

---

[3]     In its Forms 10-K, the Company measures how $100 invested in JC Penney, the S&P 500 Index and the S&P Department Store Index would have fared from a point 5 years prior.

28.     In its Form 10-K for 2011 (p.15), the Company again shows how it lagged behind the S&P Department Store Index by 10 basis points and the broader S&P 500 by 45 basis points.

29.     Importantly, during this period, gross margins declined year-over-year in every quarter but one starting with the third quarter 2010.  Similarly, revenues were plummeting starting in the second quarter 2011, including back-to-back-quarters of nearly 5% reduction, which, as noted above, was on par with the annual reduction the Company suffered in 2008.

30.     Evercore Trust accepted the role of independent fiduciary at the end of 2009 just as these disturbing facts became public.

31.     During this time, JC Penney was in the midst of a five-year long range plan it had rolled out in 2007.  During an analyst conference held on April 17, 2007, then-CEO Mike Ullman explained precisely who JC Penney's core customers were when he expressed his "vision" that JC Penney's "accelerated growth" hinged upon making the Company "the preferred shopping choice for middle America.  (2007 Analyst Meeting Materials, at p.9 (Ex. 99.1 to Form 8-K filed on April 17, 2007)). Mike Boylson, Executive Vice President, Chief Marketing Officer of the Company, later emphasized at the same meeting that JC Penney needed to "Maintain Promotional Intensity" in order to effectively communicate with its core customers and drive sales growth.  *Id.* at p.33.

32.     This and other publicly available information made it clear that any strategy to improve the profitability and growth at JC Penney required an intense focus on the discounting and promotional strategies that had allowed it to survive and generally prosper over more than 100 years.

B.      **JC Penney Announces Its Plan to Abandon Its Core Customers**

33.     In February 2011, Ackman—a very recent big loser in retail with a 90% loss on his failed efforts with respect to turning around Target Corporation in 2009—joined JC Penney's Board of Directors at a time his hedge fund owned 18% of the Company and exposed to another 8% of JC Penney stock through swap agreements.

34.     Once on the Board, Ackman used his influence to hire Johnson as the Company's new CEO.  Ackman chose Johnson because he once led retail strategy at Apple and was famous in Silicon Valley for his introduction of Apple's stores and unique customer experience, which was a huge success for Apple.  Ackman thought Johnson could conceive a turnaround strategy the success of which would rival his past accomplishments at Apple.

35.     On June 14, 2011, JC Penney announced that Johnson would become the Company's CEO effective November 1, 2011.   JC Penney clarified soon thereafter that CEO Johnson would first assume responsibility for core merchandizing and marketing and then assume full CEO responsibilities on February 1, 2012.

36.     During a two-day event held on January 25 and 26, 2012, Johnson unveiled his "transformation" plans for JC Penney to investors.  The first fundamental change was to abandon JC Penney's prior practice of sales, coupons, and rebates, which were disparaged as retail "gimmicks."  Instead, the Company would implement a new "Fair and Square Pricing" policy where three and only three prices would be offered: (1) the "everyday" price; (2) a month-long "value" price; and (3) a "best" price offered on the first and third Fridays of every month.

37.     Johnson also announced a plan to "re-invent the JC Penney store experience" with the concept of "stores within a store."   This strategy involved physically building out 80 to 100 brand "stores" within the JC Penney store, rather than what he derided as the traditional

organization of "confusing and seemingly endless racks" found in department stores.     The strategy also involved updating and increasing the number of new brands offered by JC Penney, which ultimately involved jettisoning some tried and true JC Penney house brands, and adopting new logos.

38.     JC Penney predicted that the "simplification" of its business model accomplished through these changes would result in lowered expenses and increased gross profit margins of 40% or more.  Never mind that the Company had already crested 40% gross profit margins in the then-not-so-distant past of first quarter 2010 (41.49%) and first quarter 2011 (40.45%) and that Fiscal Year 2010 enjoyed a 39.19% gross margin, albeit in general decline as noted above.  The Company also explained that this "transformation" would be completely "self-funded" assuming $900 million in anticipated expenses cuts would offset $800 million in anticipated capital expenditures to effect the imagined transformation.

**C.     JC Penney Suffers the Easily Foreseeable Consequences Of Its Actions**

39.     On May 15, 2012, after the close of the market, the Company released its shockingly bad financial results for the first quarter 2012 ended April 28, 2012, which was the first quarter to include Johnson's ill-advised pricing strategy.  The Company reported a loss of $163 million, or $.75 per share, driven by a 20.1% decline in sales and a year-over-year reduction in gross margin from 40.5% (which was already above the goal set by Johnson at the beginning of his tenure) to 37.6%.  The market reacted with what Forbes called JC Penney's "Greatest Single-Day Loss in 40 Years"[4] dragging the Company's stock price down from $33.32 to $26.75, or 19.7%.  As noted above, the next worse single-day loss by the Company was

---

[4]   The Forbes article notes that its data from FactSet only goes back 40 years.

experienced on Black Monday 1987 when a 19.2% loss was suffered due to non-company-specific circumstances.

40.     Incredibly, the Company's COO, Michael Kramer, admitted the same day: "We did not realize how deep some of the customers were into [coupons]."  And Johnson added: "Coupons were a drug.  They really drove traffic."

41.     The Company also announced that it was cancelling its dividend, which it has yet to reinstitute and which it had cancelled only once since 2006.

42.     Given these results, the market reaction, the admissions by the Company's CEO and COO, the steady and lengthy decline in the Company's objective financial performance measures leading up to this time, and the remaining public information available at the time, Evercore knew that continued investment in JC Penney stock was imprudent under its fiduciary obligations imposed by ERISA.

43.     Instead of realizing that their turnaround plan suffered from a fundamental misunderstanding of JC Penney's core customer, JC Penney's Board and management continued to wreak havoc on the Company over the next two years.

44.     The negative impact on the Company's results only accelerated thereafter.  *Every quarter from the first quarter 2012 through the second quarter 2013 experienced double digit year-over-year percentage drops in revenue.* And every quarter save two during the same period experienced year-over-year gross margin declines, including two that featured *over 5 basis point drops in gross margin as a percent of sales*.

45.     The following chart derived from JC Penney's SEC filings shows the Company's stunning fall and continued decline through the end of Fiscal Year 2013:

| Period | Gross Margin (% of sales) | Gross Margin Δ (Y/Y) | Revenues ($B) | Revenues %Δ (Y/Y) |
|--------|---------------------------|----------------------|---------------|-------------------|
| 1Q 2012 | 37.63% | -2.82 | 3.152 | -20.06% |
| 2Q 2012 | 33.22% | -5.11 | 3.022 | -22.18% |
| 3Q 2012 | 32.52% | -4.84 | 2.927 | -26.57% |
| 4Q 2012 | 23.80% | -6.40 | 3.884 | -28.40% |
| 2012 FY | 31.31% | -4.69 | 12.985 | -24.77% |
| 1Q 2013 | 30.82% | -6.81 | 2.635 | -16.40% |
| 2Q 2013 | 29.55% | -3.67 | 2.663 | -35.90% |

46.     The market's reaction to these abysmal results is unsurprising.  As noted above, the market's reaction to the Company's first quarter 2012 results was a jaw-dropping 19.7% decline.  Even looking to the Company's stock price as of the dates of the end of the various financial reporting periods (*i.e.*, prior to the announcement of the Company's earnings each quarter), the grim truth was crystal clear no later than the beginning of the Class Period and became more disturbing with every quarter.

47.     As noted in the Company's 2012 Form 10-K (p.17), the price of JC Penney stock was $36.72 on April 22, 2012.  This was an 11.35% decline from the previous end-of-quarter. ***Every quarter save one experienced similar double digit declines from the preceding quarter commencing the first quarter 2012 through the end of Fiscal Year 2013.***  The following chart[5]

---

[5]   In Part II, Item 5 of its Forms 10-K, JC Penney includes a section called "Market for Registrant's Common Equity which provides a chart of the quarterly stock price performance of the Company for the current and immediately preceding years. This chart is derived from these public filings by the Company.

derived from JC Penney's SEC filings details these facts:

| Period | JCP Stock Close Price | % Δ |
|---|---|---|
| 1Q 2012 (4/22/12) | $ 36.72 | -11.35 |
| 2Q 2012 (7/22/12) | $ 23.00 | -37.36 |
| 3Q 2012 (10/21/12) | $ 25.46 | 10.70 |
| 4Q 2012 (1/28/12) | $ 19.88 | -21.92 |
| **2012 FY (1/28/12)** | **$ 19.88** | **-52.00 (Y/Y)** |
| 1Q 2013 (4/28/13) | $ 17.26 | -13.18 |
| 2Q 2013 (7/28/13) | $ 14.28 | -17.27 |
| 3Q 2013 (10/27/13) | $ 8.14 | -43.00 |
| 4Q 2013 (1/27/14) | $ 5.92 | -27.17 |



48.     Analysts were unanimous in their denunciation of the Company's performance throughout Johnson's tenure.

49.     The first analyst to assess the Company's dismal performance starting in the first quarter 2012 was UBS, which downgraded its advice from "neutral" to "sell" on January 11, 2013.  Maxim Group initiated coverage on February 13, 2013 with a "sell' recommendation.  Likewise, Guilford Securities downgraded from "hold" to "sell" on February 14, 2013, and Oppenheimer downgraded its advice on March 6, 2013.  Finally, even after Johnson had been ousted earlier in the month, Imperial Capital initiated its coverage of the Company with "underperform" on April 29, 2013.

50.     Johnson himself would ultimately concede his fundamental misreading of the Company's customers.  In a Businessweek article on January 9, 2013, he admitted: "I thought people were just tired of coupons and all this stuff.  The reality is all of the couponing we did, there were certain parts of the customers that loved that.  They gravitated towards stores that competed that way.  ***So our core customer, I think, was much more dependent and enjoyed coupons more than I understood***." (emphasis added).

51.     Despite the red flags existence prior to Johnson's installation as CEO and the free fall in JC Penney stock from his failed and ill-conceived business plan, Evercore Trust did nothing to protect the assets of the Plan and the interests of its participants and beneficiaries therein.

## VI.     EVERCORE'S BREACHES OF FIDUCIARY DUTY

52.     Given the above, no prudent fiduciary with basic financial performance analytics in place and with proper monitoring of other relevant public information would have allowed Plan participants to risk their retirement money on JC Penney common stock at least as early as May 15, 2012.  Stopping Plan participants from continued investment in Company stock and/or terminating the Company Stock Fund from the Plan by liquidating the Plans positions was the

only prudent course at the beginning of the Class Period.  It is not plausible that a prudent fiduciary would have done what Evercore Trust did here: absolutely nothing.  Because Evercore Trust was and is an independent fiduciary presumably lacking any insider knowledge at any point in time, doing so would not have done more harm than good with respect to the Plan's assets and the Plan's participants and beneficiaries interests therein.

53.    As a result, Evercore Trust failed to engage in proper monitoring of the Company Stock Fund as a prudent investment alternative in the Plan, including its failure as a purported "investment manager" whose sole responsibility was to evaluate and monitor the performance of a single equity.

54.    By failing to have in place rudimentary trip wires that would have spurred a prudent fiduciary into action to protect and preserve the assets of the Plan, and by failing otherwise to remove the Company Stock Fund as an investment option under the Plan and/or liquidate the Plan's holdings in Company stock in light of all relevant public information, Evercore Trust breached its fiduciary duties to the Plan and its participants and beneficiaries, and caused foreseeable damages.

## VII.    CLASS ACTION ALLEGATIONS

55.    Plaintiff brings this action as a class action pursuant to Federal Rule of Procedure 23(a), (b)(l) and/or (b)(2) on behalf of herself and the following class of persons similarly situated (the "Class"):

> All individuals, excluding Defendant, who participated in the Plan and whose individual accounts purchased and/or held the JC Penney Common Stock Fund at any time between May 15, 2012 through the present.

56.     Excluded from the Class are Defendant, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendant have or had a controlling interest.

57.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, according to the Plan's 2011 Form 5500 filed with the Department of Labor, there were approximately 110,000 active participants in the Plan, and all or nearly all are members of the Class.  These Class members participated and/or were beneficiaries of the Plan during the Class Period and most or all of their Plan accounts would have included investment in JC Penney stock.  JC Penney stock comprised over 14% of Plan assets as of January 2012.

58.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, the Plan and the other members of the Class each sustained damages arising out of Defendant's wrongful conduct in violation of federal law as complained of herein.

59.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

60.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      Whether Defendant owed a fiduciary duty to the Plan, Plaintiff and members of the Class;

b.      Whether Defendant breached its fiduciary duties owed to the Plan, Plaintiff and members of the Class by failing to act prudently and loyally and solely in the interests of the Plan and the Plan's participants and beneficiaries;

16

c.      Whether the Defendant violated ERISA; and

e.      To what extent the members of the Class have sustained damages and, if so, what is the proper measure of damages.

61.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, the Plan and the other members of the Class each sustained damages arising out of Defendant's wrongful conduct in violation of ERISA as complained of herein.

62.    Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

63.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant; (ii) Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole.

## CLAIMS FOR RELIEF

### COUNT I
### Failure to Prudently and Loyally Manage the Plan's Assets
### (Breach of Fiduciary Duty In Violation Of ERISA § 404)

64.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

65.    At all relevant times, as alleged above, Defendant was a named fiduciary pursuant to ERISA § 402(a)(1), 29 U.S.C. §1102(a)(1), or de facto fiduciary within the meaning of ERISA

§ 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, Defendant was bound by the duties of loyalty, exclusive purpose, and prudence.

66.     Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that all investments in the Company's stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan, which was to provide retirement income to Plan participants and beneficiaries.   Defendant is liable for losses incurred as a result of such investments being imprudent.

67.     As alleged above, the scope of the fiduciary duties and responsibilities of Defendant included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA.  In carrying out these responsibilities, Defendant was required to evaluate the merits of the Plan's investments on an ongoing basis and take all necessary steps to ensure that the Plan's assets were invested prudently.

68.     A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should have known would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(l)(D), 29 U.S.C. § 11 04(a)(l)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plans, including plan trustees, to do so.

69.     Yet, contrary to its duties and obligations under ERISA and the governing Plan documents, Defendant failed to loyally and prudently manage the assets of the Plan. Specifically, during the Class Period, Defendant knew or should have known that Company stock was not a suitable and appropriate investment for the Plan, but was, instead, a highly speculative and risky investment in light of the Company's serious mismanagement and precarious financial condition.  Nonetheless, during the Class Period, Defendant continued to (i) hold Company stock in the Plan and (ii) offer Company stock as an investment option for participant contributions to the Plan.  Defendant did so despite clear warning signs made out by publicly available information, including, but not limited to, the Company's Forms 10-K and 10-Q filed with the SEC.

70.     Defendant was obliged to prudently and loyally manage all of the Plan's assets. However, their duties of prudence and loyalty were especially significant with respect to Company stock because:  (a) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and (b) participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock.  In view of this, the Prudence Defendants were obliged to have in place a regular, systematic procedure for evaluating the prudence of investment in Company stock.

71.     Moreover, Defendant failed to conduct an appropriate investigation of the merits of continued investment in Company stock even in light of the Company's losses, the Company's highly risky and inappropriate practices, and the particular dangers that these practices posed to the Plan.  Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain investment in Company stock under these circumstances.

72.     The decisions of Defendant with respect to the Plan's investment in Company stock described above, under the circumstances alleged herein, abused their discretion as ERISA fiduciaries in that a prudent fiduciary acting under similar circumstances would have made different investment decisions.  Specifically, based on the above, a prudent fiduciary could not have reasonably believed that further and continued investment of the Plan's contributions and assets in Company stock was in keeping with the expectations of the Plan's settlors' expectations of how a prudent fiduciary would operate.

73.     Defendant was obligated to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

74.     According to DOL regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

75.     Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

    o The composition of the portfolio with regard to diversification;

    o The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

    o The projected return of the portfolio relative to the funding objectives of the plan.

76.   Given the public information known before and during the Class Period, the Defendant could not possibly have acted prudently when it continued to invest the Plan's assets in Company stock, especially since:

- The risk associated with the investment in Company stock during the Class Period was far above and beyond the normal, acceptable risk associated with investment in Company stock;

- Knowing of this extraordinary risk, the Defendant had a duty to avoid permitting the Plan or any participant from investing the Plan's assets in Company stock; and

- Further, knowing that the Plan was not a diversified portfolio, but was over-invested in Company stock, Defendant had a heightened responsibility to divest the Plan of Company stock if it became or remained imprudent.

77.   Defendant breached its duty of prudence by continuing to offer Company stock as an investment option for participant contributions in the Plan when Defendant knew that Company stock no longer was a prudent investment for participants' retirement savings.

78.     As a consequence of the breaches of fiduciary duties by Defendant, the Plan suffered significant losses.  If the Defendant had discharged its fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.

79.     Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the other Class members, lost approximately $300 million in retirement savings

80.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), Defendant is liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**CAUSATION**

81.    The Plan suffered approximately $300 million in principal losses alone because substantial assets of the Plan were imprudently invested or allowed to be invested by Defendant in Company stock during the Class Period, in breach of Defendant's fiduciary duties.

82.    Defendant is liable for losses to the portion of the Plan's assets invested in Company stock as a result of Participant contributions because it failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder, and doing so would not have done more harm than good to the Plan and/or Plan Participants.

83.    Defendant is liable for losses that resulted from its failure to discontinue the purchase of Company stock by Plan participants and/or the after Company stock became an imprudent investment for the Plan because doing so would not have done more harm than good to the Plan and/or Plan participants.

84.    Had Defendant properly discharged its fiduciary duties, including the duties of prudence and loyalty by eliminating Company Stock as an investment alternative when it became imprudent, the Plan would have avoided the losses that it, and indirectly, the Participants suffered.

**REMEDY FOR BREACHES OF FIDUCIARY DUTY**

85.    As noted above, as a consequence of Defendant's breaches, the Plan suffered significant losses.

86.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any

23

person who is a fiduciary … who breaches any of the … duties imposed upon fiduciaries … to make good to such Plan any losses to the Plan …."   Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

87.     With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the plan's assets to what they would have been had the plan been properly administered.

88.     Plaintiff, the Plan and the Class are therefore entitled to relief from Defendant in the form of:  (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(A)     That this Court certify this action as a class action under Fed. R. Civ. P. 23(a), (b)(1), (b)(2) and/or (b)(3);

(B)     That this Court order that Defendant make good to the Plan the losses the Plan suffered as a result of Defendant's breaches of their fiduciary duties;

(C)     That this Court order declaratory and injunctive relief as necessary and appropriate, including restoring all losses to the Plan caused by the Defendant's breaches of fiduciary duty;

(D)     That this Court order that Defendant is liable for equitable relief in the form of money paid to the Plan and its participants and beneficiaries for violating their duties as a fiduciary;

(E)     That this Court enjoin the Defendant from further violating the duties, responsibilities, and obligations imposed upon them as fiduciaries by ERISA and the Plan documents with respect to the Plan;

(F)     That this Court award to Plaintiff reasonable costs and attorney's fees as provided by the common fund doctrine, ERISA § 502(g), 29 U.S.C. § 1132(g), and other applicable law; and

(G)     That this Court grant such other relief as may be just and proper, including taxable costs and interest, as provided by law.

Dated: January 13, 2015                    Respectfully submitted,

                                            _____/s/_____

                                            Daniel M. Cohen
                                            (DC Bar # 470056)
                                            CUNEO GILBERT & LaDUCA, LLP
                                            507 C Street NE
                                            Washington, DC 20002
                                            Phone:  202-789-3960
                                            Fax:  202-789-1813
                                            Email: danielc@cuneolaw.com

Of Counsel:

**HARWOOD FEFFER LLP**
Robert I. Harwood
Peter W. Overs, Jr.
488 Madison Ave., 8th Floor
New York, New York 10022
Tel.: (212) 935-7400
Fax:  (212) 753-3630
Email: rharwood@hfesq.com
         povers@hfesq.com

### DEMAND FOR JURY TRIAL

Plaintiff and the Class request a jury trial for any and all Counts for which a trial by jury

is permitted by law.

_____/s/_____
Daniel M. Cohen
One of the Attorneys for Plaintiffs